# STATE OF NORTH CAROLINA

R E C E I V E D

NOV 04 2016

N.C. SECRETARY OF STATE

__MECKLENBURG__ County

File No. 16 CVS 11152

In The General Court Of Justice
☐ District ☒ Superior Court Division

| Name Of Plaintiff | |
|---|---|
| Susan Gagnon | |
| Address | **CIVIL SUMMONS** |
| | ☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE) |
| City, State, Zip | |
| **VERSUS** | G.S. 1A-1, Rules 3, 4 |
| Name Of Defendant(s) | Date Original Summons Issued |
| The McClatchy Company, a/k/a McClatchy Newspapers, Inc., and John J. Jordan | Date(s) Subsequent Summons(es) Issued |

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| The McClatchy Copmany, a/k/a McClatchy Newspapers, Inc. | |
| c/o NC Secretary of State, Reg. Agt. | |
| P.O. Box 29622 | |
| Raleigh, NC 27626 | |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date Issued | Time | ☐ AM |
|---|---|---|---|
| S. Luke Largess | 10/24/16 | 1:17 | ☐ PM |
| Tin, Fulton, Walker & Owen, PLLC | Signature | | |
| 301 East Park Avenue | | | |
| Charlotte, NC 28203 | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time | ☐ AM |
|---|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | | ☐ PM |
| | Signature | | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts



*State of North Carolina*
*Department of the Secretary of State*

ELAINE F. MARSHALL
SECRETARY OF STATE

November 9, 2016

## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

McClatchy Newspapers, Inc.
2100 Q Street
Sacramento, CA 95816

Re:     McClatchy Newspapers, Inc.
SOS File Number:     S201630900009
Docket Number:     16 CVS 19152

Ladies and Gentlemen:

Enclosed please find a Summons and Complaint served on the Secretary of State as statutory agent for service of process for the entity referenced above.

The Service of Process Section of the Department of the Secretary of State on November 4, 2016, received these documents. The Secretary of State is required by law to forward these documents to the entity referenced above. Pursuant to N.C.G.S. §55D-33, "Service on an entity under this subsection is effective for all purposes from and after the date of the service on the Secretary of State."

Sincerely yours,

Angélique Lanier
Service of Process Agent

Enclosure

cc:
S. Luke Largess
TIN, FULTON, WALKER & OWEN, PLLC
301 E Park Ave
Charlotte, NC 28203

Case 3:17-cv-00382-FDW-DSC   Document 1-1   Filed 07/03/17   Page 3 of 43

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-~~19152~~ 19132

2016 OCT 28 A 11: 16

MECKLENBURG CO., C.S.C.
BY

---

SUSAN GAGNON,

        Plaintiff,

v.

THE MCCLATCHY COMPANY, a/k/a
MCCLATCHY NEWSPAPERS, INC.,
and JOHN J. JORDAN,

        Defendants.

---

**AMENDED COMPLAINT**

## PARTIES

1.    Plaintiff is a citizen and resident of Mecklenburg County. She was employed by Defendant McClatchy Newspapers, Inc., in Mecklenburg County from March 2004 until her discharge on October 30, 2015 under the unlawful circumstances described below.

2.    Defendant The McClatchy Company, a/k/a, McClatchy Newspapers, Inc. ("McClatchy") is a Delaware corporation duly registered with the Secretary of State to conduct business in North Carolina. It owns and publishes two daily newspapers in North Carolina, the Charlotte Observer and the Raleigh News & Observer.

3.    At all times pertinent to this Complaint, it employed more than 15 people in this state, making it an "employer" for purposes of the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.2.

4.    Defendant John J. Jordan ("Jordan"), on information and belief, is a citizen and resident of Wake County, North Carolina and was Plaintiff's supervisor at all times relevant to the claims in this case.

## JURISDICTION AND VENUE

5.    Plaintiff brings this action under the common law of North Carolina, alleging wrongful discharge in violation of public policy against McClatchy and tortious interference with contract against Jordan.

6.     The Superior Court has jurisdiction over this matter under Chapter 7A of the General Statutes and Article IV, § 12(3) of the state constitution. Plaintiff seeks damages in excess of $10,000.

7.     Plaintiff worked for Defendant in Mecklenburg County at all times complained of, so venue is proper in this Court.

## FACTS

8.     McClatchy's predecessor, Knight-Ridder, hired Plaintiff in March 2004 as a recruitment advertising manager for the Charlotte Observer.

9.     Recruitment advertising refers to job opening ads placed by companies in a newspaper.

10.    Plaintiff was successful at that job, received good evaluations, annual pay raises.

11.    In 2006. McClatchy purchased Knight-Ridder, which included ownership of the Charlotte Observer.

12.    In July 2007, Plaintiff was named revenue manager for recruitment advertising for the entire McClatchy chain.

13.    Her new position involved sales training of recruitment advertising managers and sales representatives at each of the McClatchy papers in the processes for providing and selling online resources in addition to traditional print advertising sales.

14.    It also involved maintaining a relationship with CareerBuilder.com, then the major online platform for recruitment advertising.

15.    She received good evaluations and, in 2008, was given the additional responsibility of revenue development with Apartments.com, a major online apartment rental advertiser.

16.    Plaintiff continued to perform well and receive strong reviews and pay raises.

17.    In January 2012, McClatchy had reorganized the digital component of its operations and changed Plaintiff's job title to manager of digital revenue development.

18.    Though her responsibilities remained the same, she now reported to Defendant Jordan, who was named the Director of digital revenue development and was based out of a McClatchy office in Cary, N.C.

19.    Under Jordan and the newly reorganized digital revenue department, Plaintiff now received quarterly management bonuses and annual pay-raises except in a year when all wages were frozen across the company.

20.    In January 2013, Jordan asked Plaintiff to take on McClatchy's advertising product, dealsaver.com.

21.    This program provided advertising for businesses in the form of discount coupons for a business' products or services for consumers. The coupons were advertised in digital and print versions of the local McClatchy newspaper and through direct e-mail marketing by the local newspaper.

22.    Plaintiff managed dealsaver.com for two years without negative feedback from Jordan.

23.    During that period, about two-thirds of the McClatchy newspaper shifted resources away from dealsaver.com into other advertising areas. Those papers reduced or eliminated the staff sales positions for dealsaver.com. The Charlotte Observer, for example, went from three staff positions to none.

24.    In January 2015, Jordan asked Plaintiff to take back recruitment advertising in addition to managing dealsaver.com. He reassigned the person who had been managing digital recruitment advertising.

25.    Digital recruitment advertising revenues were about six times more than the revenue from dealsaver.com. There were also significant additional revenues from print recruitment advertising, which Plaintiff now managed.

26.    Plaintiff worked on both capacities into the spring of 2015 without any significant concerns from Jordan about her work performance, but then she drew his ire.

27.    On April 10, 2015, Plaintiff informed Jordan that she would not be able to attend a digital revenue team meeting in Raleigh that Jordan had scheduled for April 30, 2015.

28. Her father-in-law had recently died and she had just learned that her significantly disabled mother-in-law would be staying with Plaintiff that week in a transition from living in upstate New York to moving to Arizona to live with her daughter.

29. The mother-in-law suffered from advanced Parkinson's disease, was wheelchair bound and in need of constant care.

30. The mother-in-law would stay with Plaintiff that week after a burial service in upstate New York until her daughter could come to Charlotte to take the mother-in-law to Arizona to live.

31. Plaintiff offered to attend the meeting by phone.

32. Jordan refused Plaintiff's proposal

33. On April 13, 2015, according to documentation, Jordan contacted human resources at McClatchy to complain about Plaintiff for the first time. Plaintiff did not know about this complaint.

34. On April 29, 2015, Jordan e-mailed Plaintiff and urged her to reconsider attending the April 30 meeting in person. Plaintiff responded that she could not do so.

35. On May 1, 2015, Jordan placed Plaintiff on a 90-day performance improvement plan (PIP) without prior warning about any work concerns.

36. Plaintiff was taken aback at the PIP and at the false information recited in it and submitted a rebuttal in writing on May 4, 2015.

37. Jordan and Plaintiff discussed her rebuttal on May 4, 2015 and she explained her disagreement with many of the assertions in the PIP.

38. Jordan refused to change the PIP, which included language that Plaintiff would have to begin to working at the Charlotte Observer's offices instead of from home.

39. Plaintiff had worked from home for eight years without concerns from anyone above her in management. In 2014, she began to suffer from vertigo and irritable bowel syndrome or IBS, so working from home had become medically necessary.

40. In follow up communications, that transition to working at the Observer was set for June 1.

41.     On May 22, Jordan told Plaintiff the date was delayed to June 8.   He went on vacation in the interim.

42.     Plaintiff and Jordan met at the Charlotte Observer on June 9.

43.     At that meeting, Plaintiff explained her medical issues to Jordan and the fact that she needed to work from home for medical reasons.  Jordan already knew about the vertigo but had not known about the IBS.

44.     Jordan advised Plaintiff to contacted McClatchy's human resources department to discuss her medical concerns.

45.     Plaintiff contacted human resources that same day and requested a disability accommodation to be able to work from home.

46.     Human resources allowed Plaintiff to continue to work from home while it considered her accommodation request and directed Plaintiff to communicate with human resources rather than her supervisor, Jordan, about the disability accommodation request.

47.     Plaintiff completed the 90-day PIP period on July 31, 2015 or August 1, 2015 without comment from Jordan.

48.     During the PIP, Plaintiff and others in her department filled out a spread sheet listing the equipment they used on their jobs.  Plaintiff had the oldest lap top of anyone on the team.

49.     Plaintiff continued to work from home through the summer while waiting on a response to her accommodation request.

50.     On August 28, 2015, McClatchy's human resources department approved Plaintiff's disability accommodation request and agreed formally that she could continue to work from home.

51.     After the PIP was over, Jordan told Plaintiff that he had noticed the age of her laptop computer and had approved issuance of a new one.

52.     Plaintiff then received a new computer that was shipped to her home.   She assumed from these actions and the lack of negative feedback since May that Jordan was satisfied with her work.

53.     Jordan and Plaintiff then scheduled a meeting for September 18, 2015 to discuss 4th Quarter goals for digital revenue.  Jordan planned to be at the Charlotte Observer that day for other meetings as well.

54.     The day before the meeting, September 17, 2015, Plaintiff sent Jordan an e-mail asking whether they would be meeting by phone or in person at the Observer.

55.     Jordan did not respond to the e-mail, so Plaintiff sent another e-mail that evening, stating that she assumed they would meet by phone since she had not heard from him.

56.     The next day, Jordan called her from the Observer and asked if Plaintiff was in the building.

57.     Plaintiff stated that she was at home and Jordan blew up.

58.     She explained that she had sent two emails the day before asking about the meeting but had not heard back from him and assumed they were meeting by phone.

59.     Jordan read the emails for the first time as they were talking on the phone.  He asked angrily why Plaintiff was working from home.

60.     Plaintiff explained that she had received a disability accommodation from human resources and it was approved on August 28, 2015.

61.     Jordan got even angrier, stating that their conversation was the first he had heard of the arrangement.

62.     Plaintiff explained that she assumed that human resources had informed him, and that she had been directed to work with them on the request and to not discuss it with Jordan.

63.     Jordan said he would talk with her later that day.

64.     Jordan and Plaintiff met at the paper at 2:30 p.m., purportedly to discuss her marketing plan for the fourth quarter for dealsaver.com and recruitment advertising.

65.     Plaintiff opened her computer, Jordan opened his, and he immediately told Plaintiff he was "extending" the prior PIP.  They spent the 30-minute meeting discussing the PIP; they did not discuss her Fourth Quarter plan at all.

66.     Jordan told Plaintiff that she could resign with some severance or he would reinstate the PIP and he wanted an immediate answer.

67.     Plaintiff was taken by complete surprise and said she needed to consult with a lawyer.

68.     Jordan told her she could have until noon on the coming Monday, September 21, to decide.

69.     On Saturday September 19, Jordan sent Plaintiff an email with the new PIP.

70.     Plaintiff sent human resources an email on Monday morning, September 21, 2015 and expressed her dismay at Jordan's reaction on Friday to learning that Plaintiff was working from home as a disability accommodation; that Jordan told her to resign or be put back on a PIP that she had already completed successfully.

71.     Human resources offered no support to Plaintiff.

72.     Plaintiff sent Jordan an e-mail on September 21, 2015 telling him that she had decided not to resign, that she had completed the PIP in the summer without comment from him and he had extended the PIP in response to finding out that she had been granted an ADA accommodation.

73.     Jordan's only response was to schedule a meeting for September 24, 2015, where he presented the PIP "extension."

74.     The new PIP ran through the end of October.

75.     The new PIP was a pretext for firing Plaintiff for obtaining the accommodation to work from home after Jordan had ordered her to report to work at the Observer.

76.     The PIP only contained concerns about dealsaver.com, a small percentage of the advertising revenue that Plaintiff managed, and only involved three of the 28 McClatchy newspaper markets – Tacoma, WA, Charlotte, NC, and Bradenton, FL.

77.     Plaintiff had no direct authority in these three markets. She could only advise the papers on the dealsaver.com programs, but could not hold anyone accountable for sales efforts and/or goals.

78.     In fact, the management at each of the three papers had made decisions to limit the dealsaver.com programs.

79.     In both Tacoma and Charlotte, the newspaper had eliminated all dealsaver.com sales positions; neither paper had a sales manager or sales representative for making and closing deals through dealsaver.com. Yet Jordan blamed Plaintiff for the lack of sales.

80.     Jordan had come to his position in Cary from Tacoma and knew the management there quite well; he knew the paper was not putting resources into dealsaver.com, yet blamed Plaintiff.

81.     In Bradenton, the paper there had considered expanding its dealsaver.com program into the nearby Sarasota market. But the paper had little or no circulation in Sarasota and little or no contacts with businesses there that might participate in a dealsaver.com, coupon campaign. It would take time to build relationships in that market.

82.     The management of the Bradenton paper had decided not to proceed with the program for those resource and timing reasons. Jordan knew that, but blamed Plaintiff.

83.     The new PIP did not mention any concerns with the recruitment advertising program, which Plaintiff continued to manage and just the digital portion of which generated six times more revenue for McClatchy than did dealsaver.com. And the print revenue from recruitment advertising, which Plaintiff managed, generated additional revenue beyond that digital portion.

84.     Plaintiff gave Jordan weekly reports on her progress as the PIP required.

85.     Jordan did not respond to any of the reports.

86.     At least several days beforehand, Jordan asked Plaintiff to meet him at the paper on October 30, 2015.

87.     At the meeting, Jordan called Human Resources in Sacramento and put a person there, Carmen Johnson, on a speaker phone.

88.     Jordan spoke very briefly, told Plaintiff that she was being terminated and that Johnson would review the package with her. He then left the room.

89.     Johnson then reviewed a packet of separation documents that Jordan had handed to her.

90.     Plaintiff left the meeting and handed Jordan her laptop, company credit card, and cell phone; he gave her a pay check in return.

91.     As a result of being terminated, Plaintiff lost over $100,000 in annual earnings as well as health insurance and other benefits. She also suffered emotional distress from the humiliation of being terminated and the loss of gainful employment.

92.     Plaintiff is 64 years old and has been unable to find other work.

93.     A person in his late 30s took over dealsaver.com

94.     A person in her 40s took over recruitment advertising.

95.     The digital revenue development team had almost tripled in size after Jordan was named the director.

96.     Every new person whom Jordan hired to expand the team was substantially younger than Plaintiff.

## FIRST CLAIM FOR RELIEF
(Wrongful Discharge)

97.     All prior paragraphs are incorporated by reference.

98.     Plaintiff was terminated, at least in part, out of her boss's anger expressed indignation that she was working from home due to a disabling or handicapping medical condition.

99.     Plaintiff was allowed to work from home based upon a disability accommodation approved by McClatchy's human resource department, but was fired for doing so.

100.    The purported reasons for terminating Plaintiff, the deficiencies in the three dealsaver.com programs, were a pretext for her dismissal, as explained in paragraphs 62-69 above.

101.    The North Carolina Legislature has declared in the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.2, that:

> (a) It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age,

biological sex or handicap by employers which regularly employ 15 or more employees.

(b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

102. Defendants' actions in terminating Plaintiff on account of her disability/handicap and/or on account of her age, directly violated this express public policy of the State of North Carolina. Thus, the termination of Plaintiff was wrongful and unlawful.

103. As a result of that wrongful discharge, Plaintiff has suffered loss of income and benefits – past, present and future -- as well as humiliation and emotional distress. She seeks and is entitled to compensatory tort damages and reinstatement with back pay or, alternatively, a reasonable award of front pay in lieu of reinstatement.

104. The actions of Defendants were taken and approved by its owner and top manager and were contrary to the public interest. Defendant's conduct showed actual malice and willful and wanton disregard for Plaintiff's rights Defendant showed actual malice toward Plaintiff.

105. Plaintiff seeks and is entitled to punitive damages from the Defendant to the maximum extent allowed by Chapter 1D of the General Statutes.

## SECOND CLAIM FOR RELIEF
(Tortious Interference with Employment)

106. Plaintiff incorporates all prior paragraphs by reference.

107. Though terminable at will, Plaintiff employment with McClatchy was a contractual relationship under North Caroline common law.

108. Defendant Jordan was a "non-outsider" to that contractual relationship between Plaintiff and McClatchy and knew of the contract.

109. Jordan interfered in Plaintiff's contract of employment with McClatchy by twice placing her on performance improvement plans and for reasons unrelated to any legitimate business interest, but in reaction to her having to miss a meeting to care for her disabled mother in law and then for securing a disability accommodation, and then securing her termination.

110. He first placed her on a "PIP" because Plaintiff missed a meeting to care for her wheelchair bound mother-in-law. He then placed her on a PIP a second time because Plaintiff had sought and obtained a disability accommodation to allow her to work from home, a fact that made Jordan furious.

111. Jordan then secured the termination of Plaintiff's employment a week after the end of the second performance improvement plans.

112. Jordan's interference in Plaintiff's employment was based on actual and legal malice toward Plaintiff. Securing the termination of Plaintiff's employment in explicit anger at her obtaining a disability accommodation was not lawful and did not further or protect any legitimate business interest of McClatchy.

113. As a result of Jordan's intentional interference with Plaintiff's employment, Plaintiff lost her job and suffered lost wages and benefits, both past and future, as well as emotional distress and anxiety.

114. Plaintiff seeks and is entitled to actual and compensatory damages from Jordan for her substantial lost wages and benefits and emotional distress and anxiety and other compensable harms resulting from Jordan's intentional interference in his employment with McClatchy.

115. Jordan's conduct involved actual malice toward Plaintiff and willful and wanton disregard of her rights. She seeks and is entitled to punitive damages to the extent allowed under Chapter 1D of the General Statutes.

## JURY DEMAND

116. Plaintiff demands that all matters be tried before a jury of her peers.

## PRAYER FOR RELIEF

Upon the trial of this matter, Plaintiff prays that the Court enter Judgment for him and award the following relief:

a. Actual and compensatory damages in excess of $25,000;

b. Punitive damages against each Defendant to the extent allowed under Chapter 1D of the North Carolina General Statutes;

c. The costs of this action;

d. Interest on the judgment at the statutory rate; and,

e. Any further the relief the Court deems just and necessary.

Respectfully submitted this _____ day of October, 2016.

S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, P.L.L.C.
301 East Park Avenue
Charlotte, NC 28203
(704) 338-1220
llargess@tinfulton.com
Attorney for the Plaintiff

CERTIFICATE OF SERVICE

I certify that I have served the foregoing Amended Complaint on opposing counsel by:

Depositing a copy hereof in a first-class, postage-prepaid, certified mail, return receipt requested, properly-addressed wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service, addressed to the attorney for each said party as follows:

The McClatchy Company
a/k/a McClatchy Newspapers, Inc.
c/o NC Secretary of State, Reg. Agt.
P.O. Box 29622
Raleigh, NC 27626

John J. Jordan
215 S. McDowell Street
Raleigh, NC 27601

This is the 28th day of October, 2016.

S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, PLLC
301 East Park Avenue
Charlotte, NC 28203
Tel.: 704-338-1220
Fax: 704-338-1312
llargess@tinfulton.com

Attorney for the Plaintiff

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

FILED
IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-__14132__

---

SUSAN GAGNON,

          Plaintiff,

v.

THE MCCLATCHY COMPANY, a/k/a
MCCLATCHY NEWSPAPERS, INC.,
and JOHN J. JORDAN,

          Defendants.

**COMPLAINT**

---

## PARTIES

1.     Plaintiff is a citizen and resident of Mecklenburg County. She was employed by Defendant McClatchy Newspapers, Inc., in Mecklenburg County from March 2004 until her discharge on October 30, 2015 under the unlawful circumstances described below.

2.     Defendant The McClatchy Company, a/k/a, McClatchy Newspapers, Inc. ("McClatchy") is a Delaware corporation duly registered with the Secretary of State to conduct business in North Carolina. It owns and publishes two daily newspapers in North Carolina, the Charlotte Observer and the Raleigh News & Observer.

3.     At all times pertinent to this Complaint, it employed more than 15 people in this state, making it an "employer" for purposes of the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.2.

4.     Defendant John J. Jordan ("Jordan"), on information and belief, is a citizen and resident of Wake County, North Carolina and was Plaintiff's supervisor at all times relevant to the claims in this case.

## JURISDICTION AND VENUE

5.     Plaintiff brings this action under the common law of North Carolina, alleging wrongful discharge in violation of public policy against McClatchy and tortious interference with contract against Jordan.

6. The Superior Court has jurisdiction over this matter under Chapter 7A of the General Statutes and Article IV, § 12(3) of the state constitution. Plaintiff seeks damages in excess of $10,000.

7. Plaintiff worked for Defendant in Mecklenburg County at all times complained of, so venue is proper in this Court.

## FACTS

8. McClatchy's predecessor, Knight-Ridder, hired Plaintiff in March 2004 as a recruitment advertising manager for the Charlotte Observer.

9. Recruitment advertising refers to job opening ads placed by companies in a newspaper.

10. Plaintiff was successful at that job, received good evaluations, annual pay raises.

11. In 2006. McClatchy purchased Knight-Ridder, which included ownership of the Charlotte Observer.

12. In July 2007, Plaintiff was named revenue manager for recruitment advertising for the entire McClatchy chain.

13. Her new position involved sales training of recruitment advertising managers and sales representatives at each of the McClatchy papers in the processes for providing and selling online resources in addition to traditional print advertising sales.

14. It also involved maintaining a relationship with CareerBuilder.com, then the major online platform for recruitment advertising.

15. She received good evaluations and, in 2008, was given the additional responsibility of revenue development with Apartments.com, a major online apartment rental advertiser.

16. Plaintiff continued to perform well and receive strong reviews and pay raises.

17. In January 2012, McClatchy had reorganized the digital component of its operations and changed Plaintiff's job title to manager of digital revenue development.

18.     Though her responsibilities remained the same, she now reported to Defendant Jordan, who was named the Director of digital revenue development and was based out of a McClatchy office in Cary, N.C.

19.     Under Jordan and the newly reorganized digital revenue department, Plaintiff now received quarterly management bonuses and annual pay-raises except in a year when all wages were frozen across the company.

20.     In January 2013, Jordan asked Plaintiff to take on McClatchy's advertising product, dealsaver.com.

21.     This program provided advertising for businesses in the form of discount coupons for a business' products or services for consumers. The coupons were advertised in digital and print versions of the local McClatchy newspaper and through direct e-mail marketing by the local newspaper.

22.     Plaintiff managed dealsaver.com for two years without negative feedback from Jordan.

23.     During that period, about two-thirds of the McClatchy newspaper shifted resources away from dealsaver.com into other advertising areas. Those papers reduced or eliminated the staff sales positions for dealsaver.com. The Charlotte Observer, for example, went from three staff positions to none.

24.     In January 2015, Jordan asked Plaintiff to take back recruitment advertising in addition to managing dealsaver.com. He reassigned the person who had been managing digital recruitment advertising.

25.     Digital recruitment advertising revenues were about six times more than the revenue from dealsaver.com. There were also significant additional revenues from print recruitment advertising, which Plaintiff now managed.

26.     Plaintiff worked on both capacities into the spring of 2015 without any significant concerns from Jordan about her work performance, but then she drew his ire.

27.     On April 10, 2015, Plaintiff informed Jordan that she would not be able to attend a digital revenue team meeting in Raleigh that Jordan had scheduled for April 30, 2015.

28.     Her father-in-law had recently died and she had just learned that her significantly disabled mother-in-law would be staying with Plaintiff that week in a transition from living in upstate New York to moving to Arizona to live with her daughter.

29.     The mother-in-law suffered from advanced Parkinson's disease, was wheelchair bound and in need of constant care.

30.     The mother-in-law would stay with Plaintiff that week after a burial service in upstate New York until her daughter could come to Charlotte to take the mother-in-law to Arizona to live.

31.     Plaintiff offered to attend the meeting by phone.

32.     Jordan refused Plaintiff's proposal

33.     On April 13, 2015, according to documentation, Jordan contacted human resources at McClatchy to complain about Plaintiff for the first time.   Plaintiff did not know about this complaint.

34.     On April 29, 2015, Jordan e-mailed Plaintiff and urged her to reconsider attending the April 30 meeting in person.   Plaintiff responded that she could not do so.

35.     On May 1, 2015, Jordan placed Plaintiff on a 90-day performance improvement plan (PIP) without prior warning about any work concerns.

36.     Plaintiff was taken aback at the PIP and at the false information recited in it and submitted a rebuttal in writing on May 4, 2015.

37.     Jordan and Plaintiff discussed her rebuttal on May 4, 2015 and she explained her disagreement with many of the assertions in the PIP.

38.     Jordan refused to change the PIP, which included language that Plaintiff would have to begin to working at the Charlotte Observer's offices instead of from home.

39.     Plaintiff had worked from home for eight years without concerns from anyone above her in management.   In 2014, she began to suffer from vertigo and irritable bowel syndrome or IBS, so working from home had become medically necessary.

40.     In follow up communications, that transition to working at the Observer was set for June 1.

41. On May 22, Jordan told Plaintiff the date was delayed to June 8. He went on vacation in the interim.

42. Plaintiff and Jordan met at the Charlotte Observer on June 9.

43. At that meeting, Plaintiff explained her medical issues to Jordan and the fact that she needed to work from home for medical reasons. Jordan already knew about the vertigo but had not known about the IBS.

44. Jordan advised Plaintiff to contacted McClatchy's human resources department to discuss her medical concerns.

45. Plaintiff contacted human resources that same day and requested a disability accommodation to be able to work from home.

46. Human resources allowed Plaintiff to continue to work from home while it considered her accommodation request and directed Plaintiff to communicate with human resources rather than her supervisor, Jordan, about the disability accommodation request.

47. Plaintiff completed the 90-day PIP period on July 31, 2015 or August 1, 2015 without comment from Jordan.

48. During the PIP, Plaintiff and others in her department filled out a spread sheet listing the equipment they used on their jobs. Plaintiff had the oldest lap top of anyone on the team.

49. Plaintiff continued to work from home through the summer while waiting on a response to her accommodation request.

50. On August 28, 2015, McClatchy's human resources department approved Plaintiff's disability accommodation request and agreed formally that she could continue to work from home.

51. After the PIP was over, Jordan told Plaintiff that he had noticed the age of her laptop computer and had approved issuance of a new one.

52. Plaintiff then received a new computer that was shipped to her home. She assumed from these actions and the lack of negative feedback since May that Jordan was satisfied with her work.

53.     Jordan and Plaintiff then scheduled a meeting for September 18, 2015 to discuss 4th Quarter goals for digital revenue. Jordan planned to be at the Charlotte Observer that day for other meetings as well.

54.     The day before the meeting, September 17, 2015, Plaintiff sent Jordan an e-mail asking whether they would be meeting by phone or in person at the Observer.

55.     Jordan did not respond to the e-mail, so Plaintiff sent another e-mail that evening, stating that she assumed they would meet by phone since she had not heard from him.

56.     The next day, Jordan called her from the Observer and asked if Plaintiff was in the building.

57.     Plaintiff stated that she was at home and Jordan blew up.

58.     She explained that she had sent two emails the day before asking about the meeting but had not heard back from him and assumed they were meeting by phone.

59.     Jordan read the emails for the first time as they were talking on the phone. He asked angrily why Plaintiff was working from home.

60.     Plaintiff explained that she had received a disability accommodation from human resources and it was approved on August 28, 2015.

61.     Jordan got even angrier, stating that their conversation was the first he had heard of the arrangement.

62.     Plaintiff explained that she assumed that human resources had informed him, and that she had been directed to work with them on the request and to not discuss it with Jordan.

63.     Jordan said he would talk with her later that day.

64.     Jordan and Plaintiff met at the paper at 2:30 p.m., purportedly to discuss her marketing plan for the fourth quarter for dealsaver.com and recruitment advertising.

65.     Plaintiff opened her computer, Jordan opened his, and he immediately told Plaintiff he was "extending" the prior PIP. They spent the 30-minute meeting discussing the PIP; they did not discuss her Fourth Quarter plan at all.

66.     Jordan told Plaintiff that she could resign with some severance or he would reinstate the PIP and he wanted an immediate answer.

67.     Plaintiff was taken by complete surprise and said she needed to consult with a lawyer.

68.     Jordan told her she could have until noon on the coming Monday, September 21, to decide.

69.     On Saturday September 19, Jordan sent Plaintiff an email with the new PIP.

70.     Plaintiff sent human resources an email on Monday morning, September 21, 2015 and expressed her dismay at Jordan's reaction on Friday to learning that Plaintiff was working from home as a disability accommodation; that Jordan told her to resign or be put back on a PIP that she had already completed successfully.

71.     Human resources offered no support to Plaintiff.

72.     Plaintiff sent Jordan an e-mail on September 21, 2015 telling him that she had decided not to resign, that she had completed the PIP in the summer without comment from him and he had extended the PIP in response to finding out that she had been granted an ADA accommodation.

73.     Jordan's only response was to schedule a meeting for September 24, 2015, where he presented the PIP "extension."

74.     The new PIP ran through the end of October.

75.     The new PIP was a pretext for firing Plaintiff for obtaining the accommodation to work from home after Jordan had ordered her to report to work at the Observer.

76.     The PIP only contained concerns about dealsaver.com, a small percentage of the advertising revenue that Plaintiff managed, and only involved three of the 28 McClatchy newspaper markets – Tacoma, WA, Charlotte, NC, and Bradenton, FL.

77.     Plaintiff had no direct authority in these three markets. She could only advise the papers on the dealsaver.com programs, but could not hold anyone accountable for sales efforts and/or goals.

78.     In fact, the management at each of the three papers had made decisions to limit the dealsaver.com programs.

79.     In both Tacoma and Charlotte, the newspaper had eliminated all dealsaver.com sales positions; neither paper had a sales manager or sales representative for making and closing deals through dealsaver.com.   Yet Jordan blamed Plaintiff for the lack of sales.

80.     Jordan had come to his position in Cary from Tacoma and knew the management there quite well; he knew the paper was not putting resources into dealsaver.com, yet blamed Plaintiff.

81.     In Bradenton, the paper there had considered expanding its dealsaver.com program into the nearby Sarasota market.   But the paper had little or no circulation in Sarasota and little or no contacts with businesses there that might participate in a dealsaver.com, coupon campaign.   It would take time to build relationships in that market.

82.     The management of the Bradenton paper had decided not to proceed with the program for those resource and timing reasons.   Jordan knew that, but blamed Plaintiff.

83.     The new PIP did not mention any concerns with the recruitment advertising program, which Plaintiff continued to manage and just the digital portion of which generated six times more revenue for McClatchy than did dealsaver.com.   And the print revenue from recruitment advertising, which Plaintiff managed, generated additional revenue beyond that digital portion.

84.     Plaintiff gave Jordan weekly reports on her progress as the PIP required.

85.     Jordan did not respond to any of the reports.

86.     At least several days beforehand, Jordan asked Plaintiff to meet him at the paper on October 30, 2015.

87.     At the meeting, Jordan called Human Resources in Sacramento and put a person there, Carmen Johnson, on a speaker phone.

88.     Jordan spoke very briefly, told Plaintiff that she was being terminated and that Johnson would review the package with her.   He then left the room.

89.     Johnson then reviewed a packet of separation documents that Jordan had handed to her.

biological sex or handicap by employers which regularly employ 15 or more employees.

(b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

102. Defendants' actions in terminating Plaintiff on account of her disability/handicap and/or on account of her age, directly violated this express public policy of the State of North Carolina. Thus, the termination of Plaintiff was wrongful and unlawful.

103. As a result of that wrongful discharge, Plaintiff has suffered loss of income and benefits – past, present and future -- as well as humiliation and emotional distress. She seeks and is entitled to compensatory tort damages and reinstatement with back pay or, alternatively, a reasonable award of front pay in lieu of reinstatement.

104. The actions of Defendants were taken and approved by its owner and top manager and were contrary to the public interest. Defendant's conduct showed actual malice and willful and wanton disregard for Plaintiff's rights Defendant showed actual malice toward Plaintiff.

105. Plaintiff seeks and is entitled to punitive damages from the Defendant to the maximum extent allowed by Chapter 1D of the General Statutes.

### SECOND CLAIM FOR RELIEF
(Tortious Interference with Employment)

106. Plaintiff incorporates all prior paragraphs by reference.

107. Though terminable at will, Plaintiff employment with McClatchy was a contractual relationship under North Caroline common law.

108. Defendant Jordan was a "non-outsider" to that contractual relationship between Plaintiff and McClatchy and knew of the contract.

109. Jordan interfered in Plaintiff's contract of employment with McClatchy by twice placing her on performance improvement plans and for reasons unrelated to any legitimate business interest, but in reaction to her having to miss a meeting to care for her disabled mother in law and then for securing a disability accommodation, and then securing her termination.

110.    He first placed her on a "PIP" because Plaintiff missed a meeting to care for her wheelchair bound mother-in-law. He then placed her on a PIP a second time because Plaintiff had sought and obtained a disability accommodation to allow her to work from home, a fact that made Jordan furious.

111.    Jordan then secured the termination of Plaintiff's employment a week after the end of the second performance improvement plans.

112.    Jordan's interference in Plaintiff's employment was based on actual and legal malice toward Plaintiff. Securing the termination of Plaintiff's employment in explicit anger at her obtaining a disability accommodation was not lawful and did not further or protect any legitimate business interest of McClatchy.

113.    As a result of Jordan's intentional interference with Plaintiff's employment, Plaintiff lost her job and suffered lost wages and benefits, both past and future, as well as emotional distress and anxiety.

114.    Plaintiff seeks and is entitled to actual and compensatory damages from Jordan for her substantial lost wages and benefits and emotional distress and anxiety and other compensable harms resulting from Jordan's intentional interference in his employment with McClatchy.

115.    Jordan's conduct involved actual malice toward Plaintiff and willful and wanton disregard of her rights. She seeks and is entitled to punitive damages to the extent allowed under Chapter 1D of the General Statutes.

### JURY DEMAND

116.    Plaintiff demands that all matters be tried before a jury of her peers.

### PRAYER FOR RELIEF

Upon the trial of this matter, Plaintiff prays that the Court enter Judgment for him and award the following relief:

a.   Actual and compensatory damages in excess of $25,000;

b.   Punitive damages against each Defendant to the extent allowed under Chapter 1D of the North Carolina General Statutes;

c.   The costs of this action;

d.   Interest on the judgment at the statutory rate; and,

e.   Any further the relief the Court deems just and necessary.

Respectfully submitted this 21st day of October, 2016.

_____

S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, P.L.L.C.
301 East Park Avenue
Charlotte, NC 28203
(704) 338-1220
llargess@tinfulton.com
Attorney for the Plaintiff

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG         16-CVS-19152

SUSAN GAGNON,

          Plaintiff,

   v.

MCCLATCHY NEWSPAPERS, INC.,
and JOHN J. JORDAN,

          Defendants.

**SECOND AMENDED COMPLAINT**

## PARTIES

1.     Plaintiff is a citizen and resident of Mecklenburg County. She was employed by Defendant McClatchy Newspapers, Inc., in Mecklenburg County from March 2004 until her discharge on October 30, 2015 under the unlawful circumstances described below.

2.     Defendant McClatchy Newspapers, Inc. ("McClatchy") is a Delaware corporation duly registered with the Secretary of State to conduct business in North Carolina. It owns and publishes two daily newspapers in North Carolina, the Charlotte Observer and the Raleigh News & Observer.

3.     At all times pertinent to this Complaint, it employed more than 15 people in this state, making it an "employer" for purposes of the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.2 and the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.*

4.     Defendant John J. Jordan ("Jordan"), on information and belief, is a citizen and resident of Wake County, North Carolina and was Plaintiff's supervisor at all times relevant to the claims in this case.

## JURISDICTION AND VENUE

5.     Plaintiff brings this action under the common law of North Carolina, alleging wrongful discharge in violation of public policy against McClatchy and tortious interference with contract against Jordan, as well as under the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. 12101, *et seq.*

6. The Superior Court has jurisdiction over this matter under Chapter 7A of the General Statutes and Article IV, § 12(3) of the state constitution and concurrent jurisdiction under the ADA. Plaintiff seeks damages in excess of $10,000.

7. Plaintiff has exhausted all administrative prerequisites to bring her ADA claim. She filed a timely charge of discrimination with the Equal Employment Opportunity Commission, number 430-2016-1137, and has received a Notice of Right to Sue dated January 31, 2017.

8. Plaintiff worked for Defendant in Mecklenburg County at all times complained of, so venue is proper in this Court.

### FACTS

9. McClatchy's predecessor, Knight-Ridder, hired Plaintiff in March 2004 as a recruitment advertising manager for the Charlotte Observer.

10. Recruitment advertising refers to job opening ads placed by companies in a newspaper.

11. Plaintiff was successful at that job, received good evaluations, annual pay raises.

12. In 2006. McClatchy purchased Knight-Ridder, which included ownership of the Charlotte Observer.

13. In July 2007, Plaintiff was named revenue manager for recruitment advertising for the entire McClatchy chain.

14. Her new position involved sales training of recruitment advertising managers and sales representatives at each of the McClatchy papers in the processes for providing and selling online resources in addition to traditional print advertising sales.

15. It also involved maintaining a relationship with CareerBuilder.com, then the major online platform for recruitment advertising.

16. She received good evaluations and, in 2008, was given the additional responsibility of revenue development with Apartments.com, a major online apartment rental advertiser.

17. Plaintiff continued to perform well and receive strong reviews and pay raises.

18.     In January 2012, McClatchy had reorganized the digital component of its operations and changed Plaintiff's job title to manager of digital revenue development.

19.     Though her responsibilities remained the same, she now reported to Defendant Jordan, who was named the Director of digital revenue development and was based out of a McClatchy office in Cary, N.C.

20.     Under Jordan and the newly reorganized digital revenue department, Plaintiff now received quarterly management bonuses and annual pay-raises except in a year when all wages were frozen across the company.

21.     In January 2013, Jordan asked Plaintiff to take on McClatchy's advertising product, dealsaver.com.

22.     This program provided advertising for businesses in the form of discount coupons for a business' products or services for consumers.   The coupons were advertised in digital and print versions of the local McClatchy newspaper and through direct e-mail marketing by the local newspaper.

23.     Plaintiff managed dealsaver.com for two years without negative feedback from Jordan.

24.     During that period, about two-thirds of the McClatchy newspaper shifted resources away from dealsaver.com into other advertising areas.  Those papers reduced or eliminated the staff sales positions for dealsaver.com.  The Charlotte Observer, for example, went from three staff positions to none.

25.     In January 2015, Jordan asked Plaintiff to take back recruitment advertising in addition to managing dealsaver.com.   He reassigned the person who had been managing digital recruitment advertising.

26.     Digital recruitment advertising revenues were about six times more than the revenue from dealsaver.com.  There were also significant additional revenues from print recruitment advertising, which Plaintiff now managed.

27.     Plaintiff worked on both capacities into the spring of 2015 without any significant concerns from Jordan about her work performance, but then she drew his ire.

28.     On April 10, 2015, Plaintiff informed Jordan that she would not be able to attend a digital revenue team meeting in Raleigh that Jordan had scheduled for April 30, 2015.

29.     Her father-in-law had recently died and she had just learned that her significantly disabled mother-in-law would be staying with Plaintiff that week in a transition from living in upstate New York to moving to Arizona to live with her daughter.

30.     The mother-in-law suffered from advanced Parkinson's disease, was wheelchair bound and in need of constant care.

31.     The mother-in-law would stay with Plaintiff that week after a burial service in upstate New York until her daughter could come to Charlotte to take the mother-in-law to Arizona to live.

32.     Plaintiff offered to attend the meeting by phone.

33.     Jordan refused Plaintiff's proposal

34.     On April 13, 2015, according to documentation, Jordan contacted human resources at McClatchy to complain about Plaintiff for the first time.   Plaintiff did not know about this complaint.

35.     On April 29, 2015, Jordan e-mailed Plaintiff and urged her to reconsider attending the April 30 meeting in person.   Plaintiff responded that she could not do so.

36.     On May 1, 2015, Jordan placed Plaintiff on a 90-day performance improvement plan (PIP) without prior warning about any work concerns.

37.     Plaintiff was taken aback at the PIP and at the false information recited in it and submitted a rebuttal in writing on May 4, 2015.

38.     Jordan and Plaintiff discussed her rebuttal on May 4, 2015 and she explained her disagreement with many of the assertions in the PIP.

39.     Jordan refused to change the PIP, which included language that Plaintiff would have to begin to working at the Charlotte Observer's offices instead of from home.

40.     Plaintiff had worked from home for eight years without concerns from anyone above her in management.   In 2014, she began to suffer from vertigo and irritable bowel syndrome or IBS, so working from home had become medically necessary.

41.     In follow up communications, that transition to working at the Observer was set for June 1.

42.     On May 22, Jordan told Plaintiff the date was delayed to June 8.   He went on vacation in the interim.

43.     Plaintiff and Jordan met at the Charlotte Observer on June 9.

44.     At that meeting, Plaintiff explained her medical issues to Jordan and the fact that she needed to work from home for medical reasons.  Jordan already knew about the vertigo but had not known about the IBS.

45.     Jordan advised Plaintiff to contacted McClatchy's human resources department to discuss her medical concerns.

46.     Plaintiff contacted human resources that same day and requested a disability accommodation to be able to work from home.

47.     Human resources allowed Plaintiff to continue to work from home while it considered her accommodation request and directed Plaintiff to communicate with human resources rather than her supervisor, Jordan, about the disability accommodation request.

48.     Plaintiff completed the 90-day PIP period on July 31, 2015 or August 1, 2015 without comment from Jordan.

49.     During the PIP, Plaintiff and others in her department filled out a spread sheet listing the equipment they used on their jobs.  Plaintiff had the oldest lap top of anyone on the team.

50.     Plaintiff continued to work from home through the summer while waiting on a response to her accommodation request.

51.     On August 28, 2015, McClatchy's human resources department approved Plaintiff's disability accommodation request and agreed formally that she could continue to work from home.

52.     After the PIP was over, Jordan told Plaintiff that he had noticed the age of her laptop computer and had approved issuance of a new one.

53. Plaintiff then received a new computer that was shipped to her home. She assumed from these actions and the lack of negative feedback since May that Jordan was satisfied with her work.

54. Jordan and Plaintiff then scheduled a meeting for September 18, 2015 to discuss 4th Quarter goals for digital revenue. Jordan planned to be at the Charlotte Observer that day for other meetings as well.

55. The day before the meeting, September 17, 2015, Plaintiff sent Jordan an e-mail asking whether they would be meeting by phone or in person at the Observer.

56. Jordan did not respond to the e-mail, so Plaintiff sent another e-mail that evening, stating that she assumed they would meet by phone since she had not heard from him.

57. The next day, Jordan called her from the Observer and asked if Plaintiff was in the building.

58. Plaintiff stated that she was at home and Jordan blew up.

59. She explained that she had sent two emails the day before asking about the meeting but had not heard back from him and assumed they were meeting by phone.

60. Jordan read the emails for the first time as they were talking on the phone. He asked angrily why Plaintiff was working from home.

61. Plaintiff explained that she had received a disability accommodation from human resources and it was approved on August 28, 2015.

62. Jordan got even angrier, stating that their conversation was the first he had heard of the arrangement.

63. Plaintiff explained that she assumed that human resources had informed him, and that she had been directed to work with them on the request and to not discuss it with Jordan.

64. Jordan said he would talk with her later that day.

65. Jordan and Plaintiff met at the paper at 2:30 p.m., purportedly to discuss her marketing plan for the fourth quarter for dealsaver.com and recruitment advertising.

66.     Plaintiff opened her computer, Jordan opened his, and he immediately told Plaintiff he was "extending" the prior PIP.  They spent the 30-minute meeting discussing the PIP; they did not discuss her Fourth Quarter plan at all.

67.     Jordan told Plaintiff that she could resign with some severance or he would reinstate the PIP and he wanted an immediate answer.

68.     Plaintiff was taken by complete surprise and said she needed to consult with a lawyer.

69.     Jordan told her she could have until noon on the coming Monday, September 21, to decide.

70.     On Saturday September 19, Jordan sent Plaintiff an email with the new PIP.

71.     Plaintiff sent human resources an email on Monday morning, September 21, 2015 and expressed her dismay at Jordan's reaction on Friday to learning that Plaintiff was working from home as a disability accommodation; that Jordan told her to resign or be put back on a PIP that she had already completed successfully.

72.     Human resources offered no support to Plaintiff.

73.     Plaintiff sent Jordan an e-mail on September 21, 2015 telling him that she had decided not to resign, that she had completed the PIP in the summer without comment from him and he had extended the PIP in response to finding out that she had been granted an ADA accommodation.

74.     Jordan's only response was to schedule a meeting for September 24, 2015, where he presented the PIP "extension."

75.     The new PIP ran through the end of October.

76.     The new PIP was a pretext for firing Plaintiff for obtaining the accommodation to work from home after Jordan had ordered her to report to work at the Observer.

77.     The PIP only contained concerns about dealsaver.com, a small percentage of the advertising revenue that Plaintiff managed, and only involved three of the 28 McClatchy newspaper markets – Tacoma, WA, Charlotte, NC, and Bradenton, FL.

78.     Plaintiff had no direct authority in these three markets.  She could only advise the papers on the dealsaver.com programs, but could not hold anyone accountable for sales efforts and/or goals.

79.     In fact, the management at each of the three papers had made decisions to limit the dealsaver.com programs.

80.     In both Tacoma and Charlotte, the newspaper had eliminated all dealsaver.com sales positions; neither paper had a sales manager or sales representative for making and closing deals through dealsaver.com.   Yet Jordan blamed Plaintiff for the lack of sales.

81.     Jordan had come to his position in Cary from Tacoma and knew the management there quite well; he knew the paper was not putting resources into dealsaver.com, yet blamed Plaintiff.

82.     In Bradenton, the paper there had considered expanding its dealsaver.com program into the nearby Sarasota market.   But the paper had little or no circulation in Sarasota and little or no contacts with businesses there that might participate in a dealsaver.com, coupon campaign.   It would take time to build relationships in that market.

83.     The management of the Bradenton paper had decided not to proceed with the program for those resource and timing reasons.   Jordan knew that, but blamed Plaintiff.

84.     The new PIP did not mention any concerns with the recruitment advertising program, which Plaintiff continued to manage and just the digital portion of which generated six times more revenue for McClatchy than did dealsaver.com.  And the print revenue from recruitment advertising, which Plaintiff managed, generated additional revenue beyond that digital portion.

85.     Plaintiff gave Jordan weekly reports on her progress as the PIP required.

86.     Jordan did not respond to any of the reports.

87.     At least several days beforehand, Jordan asked Plaintiff to meet him at the paper on October 30, 2015.

88.     At the meeting, Jordan called Human Resources in Sacramento and put a person there, Carmen Johnson, on a speaker phone.

89.     Jordan spoke very briefly, told Plaintiff that she was being terminated and that Johnson would review the package with her. He then left the room.

90.     Johnson then reviewed a packet of separation documents that Jordan had handed to her.

91.     Plaintiff left the meeting and handed Jordan her laptop, company credit card, and cell phone; he gave her a pay check in return.

92.     As a result of being terminated, Plaintiff lost over $100,000 in annual earnings as well as health insurance and other benefits. She also suffered emotional distress from the humiliation of being terminated and the loss of gainful employment.

93.     Plaintiff is 64 years old and has been unable to find other work.

94.     A person in his late 30s took over dealsaver.com

95.     A person in her 40s took over recruitment advertising.

96.     The digital revenue development team had almost tripled in size after Jordan was named the director.

97.     Every new person whom Jordan hired to expand the team was substantially younger than Plaintiff.

### FIRST CLAIM FOR RELIEF
(Wrongful Discharge)

98.     All prior paragraphs are incorporated by reference.

99.     Plaintiff was terminated, at least in part, out of her boss's anger expressed indignation that she was working from home due to a disabling or handicapping medical condition.

100.    Plaintiff was allowed to work from home based upon a disability accommodation approved by McClatchy's human resource department, but was fired for doing so.

101.    The purported reasons for terminating Plaintiff, the deficiencies in the three dealsaver.com programs, were a pretext for her dismissal, as explained in paragraphs 62-69 above.

102. The North Carolina Legislature has declared in the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.2, that:

> (a) It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, biological sex or handicap by employers which regularly employ 15 or more employees.

> (b) It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

103. Defendants' actions in terminating Plaintiff on account of her disability/handicap and/or on account of her age, directly violated this express public policy of the State of North Carolina. Thus, the termination of Plaintiff was wrongful and unlawful.

104. As a result of that wrongful discharge, Plaintiff has suffered loss of income and benefits – past, present and future -- as well as humiliation and emotional distress. She seeks and is entitled to compensatory tort damages and reinstatement with back pay or, alternatively, a reasonable award of front pay in lieu of reinstatement.

105. The actions of Defendants were taken and approved by its owner and top manager and were contrary to the public interest. Defendant's conduct showed actual malice and willful and wanton disregard for Plaintiff's rights Defendant showed actual malice toward Plaintiff.

106. Plaintiff seeks and is entitled to punitive damages from the Defendant to the maximum extent allowed by Chapter 1D of the General Statutes.

### SECOND CLAIM FOR RELIEF
(Tortious Interference with Employment)

107. Plaintiff incorporates all prior paragraphs by reference.

108. Though terminable at will, Plaintiff employment with McClatchy was a contractual relationship under North Caroline common law.

109. Defendant Jordan was a "non-outsider" to that contractual relationship between Plaintiff and McClatchy and knew of the contract.

110.     Jordan interfered in Plaintiff's contract of employment with McClatchy by twice placing her on performance improvement plans and for reasons unrelated to any legitimate business interest, but in reaction to her having to miss a meeting to care for her disabled mother in law and then for securing a disability accommodation, and then securing her termination.

111.     He first placed her on a "PIP" because Plaintiff missed a meeting to care for her wheelchair bound mother-in-law.  He then placed her on a PIP a second time because Plaintiff had sought and obtained a disability accommodation to allow her to work from home, a fact that made Jordan furious.

112.     Jordan then secured the termination of Plaintiff's employment a week after the end of the second performance improvement plans.

113.     Jordan's interference in Plaintiff's employment was based on actual and legal malice toward Plaintiff.   Securing the termination of Plaintiff's employment in explicit anger at her obtaining a disability accommodation was not lawful and did not further or protect any legitimate business interest of McClatchy.

114.     As a result of Jordan's intentional interference with Plaintiff's employment, Plaintiff lost her job and suffered lost wages and benefits, both past and future, as well as emotional distress and anxiety.

115.     Plaintiff seeks and is entitled to actual and compensatory damages from Jordan for her substantial lost wages and benefits and emotional distress and anxiety and other compensable harms resulting from Jordan's intentional interference in his employment with McClatchy.

116.     Jordan's conduct involved actual malice toward Plaintiff and willful and wanton disregard of her rights.  She seeks and is entitled to punitive damages to the extent allowed under Chapter 1D of the General Statutes.

### THIRD CLAIM FOR RELIEF
### (Americans with Disabilities Act  42 U.S.C. § 12101, *et seq.*)

117.     Plaintiff incorporates all prior paragraphs by reference

118.     Defendant McClatchy is an "employer" under 42 U.S.C. 42 U.S.C. § 12111(5)(A)

119.     Plaintiff is an "employee" under 42 U.S.C. 42 U.S.C. § 12111(5)(A) and a "qualified individual" with a disability under 42 U.S.C. 12111 (8).  Plaintiff's Irritable Bowel Syndrome and vertigo substantially impair one or more of her basic life functions, including

working, walking, driving, and sleeping; and the malfunction of her gastro-intestinal tract and organs and/or her can dramatically impair every basic life actively.

120. Plaintiff could perform the essential functions of her job with the accommodation of working from home.

121. The accommodation imposed no hardship on the employer. In fact, she had worked from home with both Defendants' permission before she became disabled.

122. Defendant McClatchy Newspapers, Inc. had notice of Plaintiff's disabilities and provided her the accommodation she had requested, but then terminated her at Jordan's insistence rather than continue to provide her that accommodation.

123. The reasons given for the termination were a pretext and further did not constitute a legitimate business justification for her dismissal.

124. In terminating Plaintiff rather than continue to accommodate her disability, Defendant McClatchy Newspapers, Inc. discriminated against Plaintiff on account of her disabling condition in violation of 42 U.S.C. § 12112(a) and § 12112(b)(5)(B).

125. Alternatively, Defendant McClatchy Newspapers, Inc. terminated Plaintiff in retaliation for seeking an accommodation, in violation of 42 U.S.C. § 12203(a). Jordan put Plaintiff back on a completed performance improvement plan upon learning she had sought ADA protection to work from home, and told her she could resign with severance immediately or be terminated in a matter of weeks.

126. As a direct result of her termination, Plaintiff suffered lost earnings and benefits as well as emotional distress and humiliation.

127. Plaintiff seeks and is entitled to back pay and reinstatement, or front pay in lieu of reinstatement, pursuant to 42 U.S.C. § 2000e-5(g)(1).

128. Plaintiff seeks and is entitled to compensatory damages under 42 U.S.C. § 1981a(a)(2).

129. Plaintiff seeks and is entitled punitive damages under 42 U.S.C. § 1981a(b), as Defendant Jordan, as a manager for McClatchy, acted with malice toward Plaintiff, and both Defendants acted with reckless indifference to Plaintiffs' ADA rights.

130. Plaintiff also seeks reasonable attorneys' fees under 42 U.S.C. § 12205

**JURY DEMAND**

131.    Plaintiff demands that all matters be tried before a jury of her peers.

**PRAYER FOR RELIEF**

Upon the trial of this matter, Plaintiff prays that the Court enter Judgment for her and award the following relief:

a.    Full equitable relief, including back pay and reinstatement, or, in lieu of reinstatement, reasonable front pay

b.    Compensatory damages in excess of $25,000;

c.    Punitive damages against each Defendant to the extent allowed under Chapter 1D of the North Carolina General Statutes and against McClatchy Newspapers, Inc. under 42 U.S.C. § 1981a (b);

d.    The costs of this action, including reasonable attorney's fees under 42 U.S.C. § 12205;

e.    Interest on the judgment at the statutory rate; and,

f.    Any further relief the Court deems just and necessary.

Respectfully submitted this 21st day of ~~April~~ June, 2017.

S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, P.L.L.C.
301 East Park Avenue
Charlotte, NC  28203
(704) 338-1220
llargess@tinfulton.com
Attorney for the Plaintiff

**CERTIFICATE OF SERVICE**

I certify that I have served the foregoing Plaintiff's Second Amended Complaint upon each of the parties to this action or, when represented, upon their attorneys of record by:

Depositing a copy hereof in a first-class, postage-prepaid, properly-addressed wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service, addressed to the attorney for Defendant as shown below, and by

Emailing a copy to the attorney for Defendant as follows:

Christopher J. Derrenbacher
Lewis Brisbois Bisgaard & Smith, LLP
4101 Lake Boone Trail, Suite 514
Raleigh, North Carolina 27607-3977
Christopher.derrenbacher@lewisbrisbois.com

This is the 22d day of June, 2017.

S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, PLLC

Attorney for the Plaintiff